**AFFIRM; and Opinion Filed July 7, 2014.**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-13-00629-CR

**GUADALUPE VILLARREAL, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 2**
**Dallas County, Texas**
**Trial Court Cause No. F-1258708-I**

## OPINION

Before Justices Fillmore, Evans, and Lewis
Opinion by Justice Fillmore

A jury convicted Guadalupe Villarreal of possession, with intent to deliver, of four grams or more but less than 200 grams of cocaine, found the enhancement paragraph alleged in the indictment to be true, found the enhancement alleged in the "Notice of the State's Intent to Enhance Punishment Range" not to be true, and sentenced Villarreal to twenty years' imprisonment. In five issues, Villarreal asserts the evidence is insufficient to support the conviction, and the trial court erred by proceeding with fewer than twelve jurors, by admitting evidence of Villarreal's and his family members' gang affiliation, and by failing to *sua sponte* include an instruction in the jury charge. We affirm the trial court's judgment.

### Background

On August 2, 2012, Detective Jennifer Castleberg and her partner, Detective Adolio Rios, were assigned to the Dallas Police Department's Gang Unit. Castleberg, Rios, and Officer

Leland Limbaugh, who was temporarily assigned to the Gang Unit, were patrolling North Oak Cliff with the objective of identifying and contacting gang members. The three officers regularly drove by the house at 713 Sabine Street while they were on patrol because it was known as a "drug house."

Castleberg testified the house was used by the 5-10 ENT division of the Junior Homeboys gang as a place to sell "dope." According to Castleberg, Villarreal's brother, Jorge Miranda, was the leader of the 5-10 ENT. Villarreal was Miranda's "right-hand man" and was entrusted by Miranda with selling drugs at the house. Castleberg had seen Villarreal at the house "more than a dozen times" during the preceding eighteen months. Although the house and the gate were usually locked, Villarreal would be in the yard and Castleberg would speak to him through the iron fence. Castleberg testified that Villarreal admitted during a prior hearing that he lived at the house, and Limbaugh also testified that Villarreal "admitted that he lived there." According to Castleberg, she had previously attempted to identify the owner of the house, but was unable to do so because there was neither water nor electric service to the house.

As the officers drove by the house on August 2, they saw that both the gate to the driveway and the front door to the house were open. Because it was unusual for the property to be unsecured, the officers decided to investigate whether the house was vacant. When the officers reached the front door to the house, they saw Angelica Villarreal, Villarreal's mother, sweeping in the dining room area. Although there was no dining room furniture, a pool table was located in the area where Angelica was sweeping.

Castleberg, who knew Angelica, greeted her and asked if the officers could come inside the house. According to all three officers, Angelica said they could enter the house. The officers entered the house, and Castleberg leaned against the pool table while she talked to Angelica. All three officers testified that Villarreal came out of a bedroom, appeared startled when he saw the

officers, went back into the bedroom, and shut the door. Castleberg told everybody in the bedroom to come out. When the bedroom door opened, Castleberg saw crack cocaine in plain view on the floor and on a table. According to Castleberg, a six-year-old boy was sitting on the floor next to a tray of individually wrapped "rocks" of crack cocaine. In response to Castleberg's request, four adult men, including Villarreal, a fourteen-year-old boy, and the six-year-old boy came out of the room.

For safety reasons, the officers performed a protective sweep of the house to ensure nobody else was present. During this sweep, Limbaugh saw there were security cameras throughout the house that fed surveillance footage to the television in the bedroom where the cocaine was found, there was no furniture in the living room, there was a pool table in the dining room, and there were no "kitchen-type" utensils. Some of the cocaine that Limbaugh saw was packaged in individual "baggies." This packaging was consistent "with the selling of drugs." These observations confirmed Limbaugh's impression that the house was a "drug house." Castleberg testified there was trash, used condoms, and buckets of urine and feces in the house, and she did not believe anybody lived in the house.

Castleberg contacted the Narcotics Unit, and officers in that unit obtained a search warrant for the house. Detective Cody Brasher, who was assigned to the Narcotics Unit, participated in the search of the house. According to Brasher, individuals working in a drug house have different roles. One person screens the potential customers, one person delivers the drugs, and one person holds the money. In Brasher's opinion, the house did not look like a "typical straight" drug house because it appeared that people were living inside the house. During the search of the house, officers found a total of 92.4 grams of crack cocaine, plastic packaging in different sizes and colors that is commonly used to package drugs for sale, glass pipes containing drug residue, a digital scale, a magnet box with a razor blade, some marijuana,

–3–

and sixteen 9 millimeter bullets. Approximately twenty-one grams of the cocaine were divided into ninety-four bags. The bulk of the cocaine was concealed in a black bag found in the corner of the bedroom. Officers also searched the men who had been present in the room and found $2,844 in the possession of Daniel Macias.

According to Angelica, she cleans the house at the request of Miranda, but Villarreal pays her for the work. Angelica testified that she was not allowed to go into the bedroom in the house and admitted the men were "probably" selling cocaine out of that room. When Castleberg asked if the officers could come into the house, Angelica asked them to wait. She then went to the bedroom, knocked on the door, and asked the "guys" if the police could come into the house. When Angelica turned away from the bedroom door, she saw that the officers were already in the house. Macias, not Villarreal, came out of the bedroom and, when he saw the officers, went back into the bedroom. Angelica testified that Castleberg called Macias by his nickname "Doughboy" and told Macias to come out of the bedroom. Efran Hernandez, the fourteen-year-old boy who was in the bedroom, testified that Macias, not Villarreal, opened the bedroom door. Both Angelica and Hernandez testified that Villarreal was asleep when the police came into the house. Hernandez also testified he did not see any cocaine in the room and believed that Miranda rented the house.

Crystal Picon, Villarreal's girlfriend, testified that Villarreal usually "stays" at the house and agreed that Villarreal was usually "in charge" of the house. She visited Villarreal at the house on August 2, 2012, but only went into his bedroom, which was not the bedroom in which the drugs were found. Picon did not go into the bedroom where the drugs were found and did not see any narcotics or cocaine. She also did not notice the used condoms or trash on the floor of Villarreal's bedroom. According to Picon, a person standing in the dining room would not have been able to see someone coming out of the bedroom.

–4–

The jury was charged on both the offense of possession of cocaine, with intent to deliver, and the lesser included offense of possession of cocaine. The jury found Villarreal guilty of the greater offense, found one enhancement paragraph to be true, and assessed punishment of twenty years' imprisonment.

**Sufficiency of the Evidence**

In his first issue, Villarreal argues the evidence is insufficient to support the conviction because the State failed to prove that he, either as a principal or a party, committed the offense.

*Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The jury, as the fact finder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence."). We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the jury. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our

judgment for that of the jury"). "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

*Applicable Law*

To prove unlawful possession of a controlled substance with intent to deliver, the State was required to establish beyond a reasonable doubt that Villarreal (1) exercised care, custody, control, or management over a controlled substance, (2) intended to deliver the controlled substance to another, and (3) knew the matter possessed was a controlled substance. *Cadoree v. State*, 331 S.W.3d 514, 524 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *Parker v. State*, 192 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(3)(D) (cocaine is a controlled substance listed in Penalty Group 1); 481.112(a) (person commits an offense if he knowingly possesses, with intent to deliver, a controlled substance listed in Penalty Group 1) (West 2010). Whether direct or circumstantial, the evidence must establish that the accused's connection with the controlled substance was more than fortuitous. *Blackman v. State*, 350 S.W.3d 588, 594–95 (Tex. Crim. App. 2011); *Poindexter v. State*, 153 S.W.3d 402, 405–06 (Tex. Crim. App. 2005). Mere presence at a location where drugs are found is insufficient, by itself, to establish possession. *Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). Further, when the accused is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband. *Poindexter*, 153 S.W.3d at 406; *see also Blackman*, 350 S.W.3d at 594–95.

A nonexclusive list of factors that can be sufficient, either singly or in combination, to establish possession of contraband include: (1) presence when a search is conducted, (2) whether the contraband was in plain view, (3) proximity to and the accessibility of the contraband, (4) the accused being under the influence of narcotics when arrested, (5) possession of other contraband or narcotics when arrested, (6) incriminating statements made by the accused when arrested, (7) an attempt to flee, (8) furtive gestures, (9) an odor of contraband, (10) the presence of other contraband or drug paraphernalia, (11) whether the accused owned or had the right to possess the place where the drugs were found, (12) whether the place where the drugs were found was enclosed, (13) possession of a large amount of cash, (14) conduct of the accused indicating a consciousness of guilt, (15) the quantity of the contraband, and (16) the accused's presence in a suspicious area under suspicious circumstances. *Evans*, 202 S.W.3d at 162 n.12; *Wright v. State*, 401 S.W.3d 813, 818–19 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Lassaint v. State*, 79 S.W.3d 736, 740–41 (Tex. App.—Corpus Christi 2002, no pet.). These are simply some factors which may circumstantially establish the sufficiency of the evidence to prove knowing possession. *Evans*, 202 S.W.3d at 162 n.12. However, no set formula of facts exists to dictate a finding of links sufficient to support an inference of knowing possession. *Taylor v. State*, 106 S.W.3d 827, 831 (Tex. App.—Dallas 2003, no pet.). The number of linking factors present is not as important as the logical force they create to prove the crime was committed. *Evans*, 202 S.W.3d at 162; *Taylor*, 106 S.W.3d at 831.

Intent to deliver a controlled substance may also be established through circumstantial evidence. *Taylor*, 106 S.W.3d at 831; *Jordan v. State*, 139 S.W.3d 723, 726 (Tex. App.—Fort Worth 2004, no pet.). It may be inferred from the acts, words, or conduct of the accused. *Taylor*, 106 S.W.3d at 831. Testimony by experienced law enforcement officers may be used to establish a defendant's intent to deliver. *Robinson v. State*, 174 S.W.3d 320, 331 (Tex. App.—

Houston [1st Dist.] 2005, pet. ref'd). We may also consider a number of factors in determining such intent, including (1) the nature of the location where the defendant was arrested, (2) the quantity of drugs the defendant possessed, (3) the manner of packaging the drugs, (4) the presence or absence of drug paraphernalia (for use or sale), (5) whether the defendant possessed a large amount of cash in addition to the drugs, (6) the defendant's status as a drug user, and (7) evidence of drug transactions. *Smith v. State*, 737 S.W.2d 933, 941 (Tex. App.—Dallas 1987, pet. ref'd); *Robinson*, 174 S.W.3d at 331; *see also Taylor*, 106 S.W.3d at 831. Again, the "number of factors present is not as important as the logical force the factors have in establishing the elements of the offense." *Moreno v. State*, 195 S.W.3d 321, 326 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (op. on reh'g).

The jury was charged that Villarreal could be guilty as a party to the offense. Under the law of parties, each party to an offense may be charged with the commission of the offense. TEX. PENAL CODE ANN. § 7.01(b) (West 2011). A person is responsible for the criminal conduct of another person if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2) (West 2011). When a party is not the "primary actor," the State must prove conduct constituting an offense plus an act by the defendant alone with the intent to promote or assist such conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). Evidence may be deemed sufficient to sustain a conviction under the law of parties if the evidence shows that the defendant was physically present at the commission of the offense and encouraged the commission of the offense either by words or other agreement. *Id.*; *Miller v. State*, 83 S.W.3d 308, 313 (Tex. App.—Austin 2002, pet. ref'd). Circumstantial evidence may suffice to show the defendant is a party to the offense. *Miller*, 83 S.W.3d at 314. While mere presence at the scene, or even flight, is not enough to sustain a conviction, such facts may be considered in determining

–8–

whether a defendant was a party to the offense. *Valdez v. State*, 623 S.W.2d 317, 321 (Tex. Crim. App. 1981) (op. on reh'g); *Miller*, 83 S.W.3d at 314. Because the charge authorized the jury to convict Villarreal as a principal or a party, the verdict will be upheld if the evidence was sufficient on either of those theories. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

*Analysis*

In this case, viewing the evidence in the light most favorable to the judgment, there was evidence the house was a "drug house" used by the 5-10 ENT division of the Junior Homeboys gang to sell drugs. According to Castleberry, Miranda was in charge of the 5-10 ENT and Villarreal was Miranda's "right-hand man." Angelica testified the men "probably" sold cocaine out of the house.

Although the gate to and the front door of the house were usually locked, Castleberg had seen Villarreal in the yard over a dozen times in the preceding eighteen months. There was also evidence that Villarreal admitted he lived at the house, and Picon testified that Villarreal "stayed" at and was "in charge" of the house. Based on the condition of the house, neither Castleberg nor Limbaugh thought anyone lived there.

When Villarreal came out of the bedroom and saw the police officers, he immediately returned to the bedroom and shut the door. He was found in the room where the drugs were discovered. There were ninety-four individually wrapped "rocks" of cocaine, at least some of which were in plain view in the room. Both Brasher and Limbaugh testified that this packaging was consistent with the sale of drugs. There was also a larger package of cocaine hidden in a black bag in the corner of the room. All of the cocaine was accessible to Villarreal. Drug paraphernalia including digital scales, plastic wrap typically used for packaging drugs, and glass pipes with residue were also discovered in the bedroom along with a small amount of marijuana.

–9–

A number of cameras located around the house fed surveillance video to the television located in the bedroom. Macias possessed a large amount of cash, and Brasher testified that different individuals in a drug house would have different duties, one of which was to keep the money.

Considering the factors applicable to determining whether Villarreal possessed and intended to distribute the cocaine, there was evidence Villarreal was present when the search was conducted; some of the cocaine was in plain view and was accessible to Villarreal; Villarreal made a furtive gesture when he attempted to return to the bedroom after seeing the police officers; there was drug paraphernalia in the bedroom; Villarreal lived or stayed in the house and was "in charge" of the house; another individual in the bedroom possessed a large amount of cash; there was a total of 92.4 grams of cocaine; some of the cocaine was packaged as individual "rocks"; this packaging was consistent with the sale of drugs; a larger amount of cocaine was concealed in a bag in the bedroom; the men were "probably" selling cocaine from the house; and the house was equipped with surveillance equipment and had a reputation as a "drug house." Viewing the evidence in the light most favorable to the verdict, and based on the logical force of all the circumstantial and direct evidence, we conclude a rational jury could determine, beyond a reasonable doubt, that Villarreal, either as the primary actor or a party, committed the charged offense. *See Jackson*, 443 U.S. at 319; *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). Accordingly, the evidence is sufficient to support the conviction. We resolve Villarreal's first issue against him.

## Composition of Jury

In his second issue, Villarreal asserts the trial court erred by proceeding, over his objection, with a jury of fewer than twelve members. A jury was selected, but not sworn, on the first day of trial. The following morning, one of the selected jurors informed the trial court that she believed she would be biased in favor of Villarreal because her husband had been convicted

of the same type of offense and she did not believe that his sentence was fair. Villarreal objected to both the removal of the juror and to the granting of a mistrial.

The trial court instructed court personnel to have the jurors brought in so that they could be dismissed and to request that a different jury panel be brought to the court room. Villarreal objected that this procedure put him in double jeopardy. The trial court indicated the original jury panel had not yet been sworn. The prosecutor then suggested the case could proceed with eleven jurors. After a discussion with his counsel, Villarreal indicated he was willing to proceed with eleven jurors, but objected to the removal of the twelfth juror.

A complaint on appeal must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see also* TEX. R. APP. P. 33.1(a) (preservation of complaint for appellate review requires complaint to trial court by timely request, objection, or motion with sufficient specificity to make trial court aware of complaint, unless specific grounds were apparent from context). At trial, Villarreal objected to the procedure that led to the removal of the twelfth juror. Villarreal not only did not object in the trial court to proceeding with fewer than twelve jurors, he agreed to do so. Accordingly, Villarreal forfeited his complaint on appeal by not properly preserving error at trial. *See* TEX. R. APP. P. 33.1(a); *Clark*, 365 S.W.3d at 339–40 (appellant failed to preserve complaint for review when trial objection did not comport with issue raised on appeal).

Even if Villarreal had preserved his issue for review, we cannot conclude the trial court erred by proceeding with eleven jurors. The parties may agree to proceed with fewer than twelve jurors. *Hatch v. State*, 958 S.W.2d 813, 815–16 (Tex. Crim. App. 1997) (citing TEX. GOV'T CODE ANN. § 62.201 (West 2013)). Further, a defendant in a criminal case may waive the requirement in article 36.29(a) of the code of criminal procedure that no less than twelve jurors can return a verdict in a non-capital felony case. *Id.* at 815–16 (citing TEX. CODE CRIM. PROC.

ANN. art. 36.29 (West Supp. 2013)). Although Villarreal objected to the removal of the twelfth juror, he agreed to proceed to trial with eleven jurors. Accordingly, the trial court did not err by proceeding to trial with fewer than twelve jurors. We resolve Villarreal's second issue against him.

## Admission of Evidence

In his third and fourth issues, Villarreal contends the trial court erred by admitting evidence in the guilt phase of the trial about his and his family members' gang affiliation because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Villarreal specifically complains about Castleberg's testimony that the Junior Homeboys are known for "dope dealing, aggravated robbery, aggravated assaults, burglary, prostitution, bootlegging. Those are the main [crimes]" and "the 5-10 ENT was a clique inside the Junior Homeboys that was based off family members of – or relatives of [Villarreal] and Jorge Miranda, their family."[1] We review the trial court's admission of evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Id.*

Villarreal contends the complained-of evidence should have been excluded under rules of evidence 403 and 404(b). Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. EVID. 403. Under rule 404(b), evidence of an accused's "other crimes, wrongs or acts is not admissible to prove the character of a person in

---

[1] Villarreal does not complain on appeal about Castleberg's testimony that he and Miranda were members of 5-10 ENT, a division of the Junior Homeboys gang, or that the 5-10 ENT sold drugs from the house at 713 Sabine.

–12–

order to show action in conformity therewith." *Id.* 404(b). Evidence of extraneous acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" *Id.* Evidence of gang membership is admissible under rule 404(b) if it is "relevant to show a non-character purpose that in turn tends to show the commission of the crime." *Ortiz v. State*, 93 S.W.3d 79, 94 (Tex. Crim. App. 2002).

Even assuming the trial court erred by admitting the complained-of evidence, we conclude Villarreal was not harmed. *See* TEX. R. APP. P. 44.2(b). The improper admission of evidence is non-constitutional error that an appellate court disregards unless the error affected an appellant's substantial rights. *Id.*; *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Casey v. State*, 215 S.W.3d 870, 884–85 (Tex. Crim. App. 2007) (using harm analysis in rule of appellate procedure 44.2(b) in determining that evidence of appellant flashing a gang sign was harmless). We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury, or influenced the jury only slightly. *Barshaw*, 342 S.W.3d at 93.

In assessing potential harm, our focus is not on whether the outcome of the trial was proper despite the error but on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Id.* at 93–94. We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Id.* at 93; *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (in conducting harm analysis "we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence"). We consider all the evidence that was admitted at trial, the nature of the evidence supporting the verdict, and the character of the alleged error and how it relates to evidence in the record. *Barshaw*, 342 S.W.3d at 94; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App.

2002). We may also consider the jury instructions, the parties' theories of the case, closing arguments, voir dire, and whether the State emphasized the error. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56.

Here, Villarreal's defense was that he was asleep in the bedroom and did not participate in the offense. However, there was evidence that Villarreal lived in, "stayed" at, or was "in charge" of the house. Castleberg and Limbaugh testified the house was a "drug house," and Castleberg testified the sole purpose of the house was to use it as a place to sell drugs. Angelica admitted that cocaine was "probably" sold out of the house. There were cameras on the house that fed surveillance video to a television in the bedroom. Villarreal and other individuals were in the bedroom with over ninety grams of crack cocaine. Ninety-four individually wrapped "rocks" of cocaine were in the room. This packaging was consistent with the sale of drugs, and at least some of these "rocks" were in plain view. Also in the bedroom was drug paraphernalia and other items commonly used in packaging and selling cocaine. When Villarreal came out of the bedroom and saw the officers, he immediately retreated into the room and shut the door. One of the other individuals in the room had over $2,800 in his possession.

Although the prosecutor referenced Villarreal's and Miranda's gang membership during closing argument and that the 5-10 ENT and the Junior Homeboys used the house at 713 Sabine to sell drugs, he did not argue that either the 5-10 ENT or the Junior Homeboys, or Villarreal as a member of these groups, were involved in any other criminal activity. The court's charge instructed the jury that, if there was evidence that Villarreal committed offenses other than the offense alleged in the indictment, the jury could not consider the evidence for any purpose unless it found beyond a reasonable doubt that Villarreal committed the other offenses. The trial court further instructed the jury that, even if it made this finding, it could consider the other offenses only in determining Villarreal's motive, opportunity, intent, plan, identity, knowledge, or

–14–

absence of mistake or accident and not for any other purpose. There is no indication in the record that the jury did not follow the trial court's instructions.

Based on the record as whole, we have a fair assurance that the two statements by Castleberg about which Villarreal complains on appeal did not influence the jury, or influenced the jury only slightly. We resolve Villarreal's third and fourth issues against him.

**Jury Charge Error**

In his fifth issue, Villarreal contends the trial court erred by failing to *sua sponte* include in its charge to the jury a "benefit of the doubt instruction." Specifically, Villarreal argues the trial court should have instructed the jury that if it "had a reasonable doubt as to whether [Villarreal] was guilty of possession with intent to deliver cocaine or straight possession of cocaine, then they should resolve that doubt in favor of possession" and he was egregiously harmed by its absence in the charge.

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If error exists, we must determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State,* 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal "only if it was so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009) (quoting *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *See Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

The purpose of the jury charge is to inform the jury of the applicable law and guide the jurors in applying it to the facts of the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). Under article 36.14 of the code of criminal procedure, the trial court shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case[.]" TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Taylor v. State*, 332 S.W.3d 483, 486 (Tex. Crim. App. 2011). This duty exists even when defense counsel fails to object to inclusions or exclusions in the charge and thus may require the trial court to *sua sponte* instruct the jury on the law applicable to the case. *Taylor*, 332 S.W.3d at 486.

As a general rule, where greater and lesser grades or degrees of an offense are charged, the court must give the jury a "benefit of the doubt" instruction if requested by the defendant. S*ee Kihega v. State*, 392 S.W.3d 828, 835 (Tex. App.—Texarkana 2013, no pet.); *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd). The instruction is given to assist the jury if it has no reasonable doubt as to the defendant's guilt, but is uncertain about the grade or degree of the offense. *Benavides*, 763 S.W.2d at 589 (citing *Richardson v. State*, 108 Tex. Crim. 318, 328, 239 S.W. 218, 224 (1922) (op. on reh'g)). Failure to include a "benefit of the doubt" instruction is not harmful to the defendant, however, if the charge as a whole leaves no uncertainty as to how to resolve any doubt. *Shelby v. State*, 724 S.W.2d 138, 140 (Tex. App.—Dallas 1987) (op. on reh'g), *vacated on other grounds*, 761 S.W.2d 5 (Tex. Crim. App. 1988) (per curiam); *Benavides*, 763 S.W.2d at 589.

In this case, the jury was instructed in relevant part as follows:

**APPLICATION OF THE LAW AND FACTS WITH REGARD TO
POSSESSION WITH INTENT TO DELIVER CHARGE**

Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about August 2, 2012, in Dallas County, Texas, the defendant, Guadalupe Villarreal, either acting alone or with another as a party to the offense, did unlawfully knowingly possess with intent to deliver a substance, to-wit: Cocaine, in an amount by aggregate weight, including any adulterants or dilutants, of 4

grams or more but less than 200 grams, as alleged in the indictment, then you will find the defendant guilty of possession with intent to deliver as charged in the indictment.

If you do not so find, or if you are unable to agree, you will next consider the following:

**APPLICATION OF THE LAW AND FACTS WITH REGARDS TO POSSESSION**

Now, if you unanimously find from the evidence beyond a reasonable doubt that on or about August 2, 2012, in Dallas County, Texas, the defendant, Guadalupe Villarreal, either acting alone or with another as party to the offense, did unlawfully knowingly possess a controlled substance, to wit: Cocaine, in an amount by aggregate weight, including any adulterants or dilutants, of 4 grams or more but less than 200 grams, as alleged in the indictment, then you will find the defendant guilty of possession of a controlled substance as included in the indictment.

If you do not so find, or if you have a reasonable doubt thereof, you shall find the defendant not guilty.

\* \* \*

All persons are presumed innocent, and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.

The prosecution has the burden of proving the defendant guilty and it must do so by proving each element as charged beyond a reasonable doubt, and if it fails to do so, you must acquit the defendant.

In *Shelby*, this Court considered a charge that included paragraphs very similar to the paragraphs quoted above. 724 S.W.2d at 139–40. The charge in *Shelby* advised the jury to find the defendant guilty of the greater offense only if the jury had no reasonable doubt he was guilty of that offense, and if the jury had any reasonable doubt, the jury should consider whether he was guilty of the lesser included offense. *Id.* The charge further advised the jury to find the defendant guilty of the lesser offense only if it had no reasonable doubt he was guilty of that offense, and if the jury had any reasonable doubt, the jury should find the defendant not guilty. *Id.* at 140. This Court concluded the paragraphs made clear to the jury that any reasonable doubt as to whether the defendant is guilty of the greater offense should be resolved against a finding

that the greater offense was committed, and any reasonable doubt as to whether he is guilty of the lesser included offense should be resolved with a not guilty finding. *Id.* Because the charge in *Shelby* left no uncertainty as to how to resolve the doubt, we concluded any error in not charging the jury on the "benefit of the doubt" was harmless. *Id.*

Villarreal acknowledges this Court's opinion in *Shelby*, but argues he was egregiously harmed by the omission of the instruction from the charge because the entire focus of his defense was to show he did not participate in the offense and, at most, was guilty as a party to possession of the cocaine. However, as in *Shelby*, the charge in this case leaves no uncertainty as to how to resolve any doubt regarding what verdict to return if the jury believed Villarreal was guilty but had reasonable doubt as to whether he was guilty of possession with intent to deliver cocaine or possession of cocaine. No further "benefit of the doubt" instruction was necessary. *See id.*; *Kihega*, 392 S.W.3d at 837–38; *Benavides*, 763 S.W.2d at 589.[2] Accordingly, Villarreal was not egregiously harmed by the trial court's failure to *sua sponte* include the "benefit of the doubt" instruction in the charge to the jury. We resolve Villarreal's fifth issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

130629F.U05

---

[2] *See also McKnight v. State*, No. 05-12-00445-CR, 2013 WL 4517276, at * 8–9 (Tex. App.—Dallas Aug. 23, 2013, no pet.) (not designated for publication).



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

GUADALUPE VILLARREAL, Appellant

No. 05-13-00629-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 2, Dallas County, Texas,
Trial Court Cause No. F-1258708-I.
Opinion delivered by Justice Fillmore,
Justices Evans and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 7th day of July, 2014.